1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10

11   NUCAL FOODS, INC.,

12              Plaintiff,                    No. 2:12-cv-2754 KJM AC

13         vs.

14   SHAWN KAYE,                              ORDER AND

15              Defendant.                    FINDINGS & RECOMMENDATIONS

16   _____/

17              Pending before the court is plaintiff's March 13, 2013 motion for default

18   judgment against defendant Shawn Kaye.[1]  The court has determined that the matter shall be

19   submitted upon the record and briefs on file and accordingly, the date for hearing of this matter

20   shall be vacated.  Local Rule 230.  On review of the motion, the documents in support, and good

21   cause appearing therefor, THE COURT FINDS AS FOLLOWS:

22                        ALLEGATIONS IN COMPLAINT

23              Plaintiff, a California agricultural cooperative association, and its predecessor

24   members have been processing, marketing, and distributing conventional and specialty farm

25   _____

26         [1]  This matter is before the undersigned pursuant to Local Rule 302(c)(19).

                                            1

1  fresh eggs produced by family-owned farms located in Northern California for over 50 years.

2  Compl. ¶ 8.  At all relevant times, plaintiff has been and is engaged in the processing, interstate

3  distribution, and marketing of conventional and specialty eggs to retail and foodservice

4  customers under the trademark of "Cal Eggs," which it has used continuously for over 17 years

5  Id. ¶¶ 9-10.  Plaintiff's "Cal Eggs" brand of eggs has been and continues to be extensively

6  advertised and sold throughout California and Nevada under the "Cal Eggs" trademark.  Id. ¶ 13.

7  By virtue of its advertising and sales, together with consumer acceptance and recognition,

8  plaintiff's mark identifies plaintiff's "Cal Eggs" brand eggs only, and distinguishes them from

9  eggs processed and sold by others.  Id.  Plaintiff claims it is entitled to protection under

10  California common law.[2]  Id.

11         At some point in either 2011 or 2012, when plaintiff attempted to register the "Cal

12  Eggs" domain name (www.caleggs.com), it learned that defendant owns the domain name,

13  having registered it on April 5, 2011.  Compl. ¶ 15.  On or about September 6, 2012, plaintiff

14  advised defendant by letter of plaintiff's ownership of the "Cal Eggs" trademark and requested

15  that defendant immediately cease and desist further use of the domain name.  Id. ¶ 18.

16  Defendant did not comply with plaintiff's request.  Id.  Instead, defendant offered to sell the

17  domain name to plaintiff for $500,000.  Id. ¶ 19.

18                          PROCEDURAL BACKGROUND

19         This action is proceeding on plaintiff's original complaint, filed November 7,

20  2012, brought against defendant and Does 1 through 10 for violating the federal Anti-

21  Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), and asserting state

22  law claims of unjust enrichment and declaratory relief.

23         The summons and complaint were served on defendant by mail on November 20,

24  2012 and by substituted service on November 19, 2012 (the documents were left with or in the

25  ───────────────────

26         [2] Plaintiff does not assert that it is the registered owner of the "Cal Eggs" mark under
    federal law.

presence of "Debra Doe – Person in Charge of Office") at the address listed on the domain

registration information for the owner of the www.caleggs.com domain name,: 11701 Moorpark

Street, Studio City, CA 91604.  ECF No. 7; Scott Decl. ¶¶ 3-4; Fed. R. Civ. P. 4(e)(2); Pacific

Atlantic Trading Co. v. M/V Main Express, 758 F.2d 1325, 1331 (9th Cir. 1985) (default

judgment void without personal jurisdiction).  Because defendant failed to file an answer or

otherwise appear in this action, the clerk entered default against him on January 11, 2013.  ECF

No. 9.

Request for entry of default and the instant motion for default judgment and

supporting papers were served by mail on defendant at three different addresses identified by

plaintiff during the course of this litigation to be attributable to defendant.  See ECF No. 15;

Scott Decl. ¶ 11.  Defendant did not file an opposition to the motion for entry of default

judgment.  Plaintiff seeks an entry of default judgment in the amount of $1,000 for violation of

the ACPA, and $14,050 for attorneys' fees and costs.[3]

LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 55, default may be entered against a

party against whom a judgment for affirmative relief is sought who fails to plead or otherwise

defend against the action.  See Fed. R. Civ. P. 55(a).  However, "[a] defendant's default does not

automatically entitle the plaintiff to a court-ordered judgment."  PepsiCo, Inc. v. Cal. Sec. Cans,

238 F. Supp. 2d 1172, 1174 (C.D. Cal. 2002) (citing Draper v. Coombs, 792 F.2d 915, 924-25

(9th Cir. 1986)); see Fed. R. Civ. P. 55(b) (governing the entry of default judgments).  Instead,

the decision to grant or deny an application for default judgment lies within the district court's

sound discretion.  Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).  In making this

determination, the court may consider the following factors:

(1) the possibility of prejudice to the plaintiff; (2) the merits of

---

[3]  Plaintiff does not seek default judgment on its claims brought under state law (unjust
enrichment and declaratory relief).

1   plaintiff's substantive claim; (3) the sufficiency of the complaint;
    (4) the sum of money at stake in the action; (5) the possibility of a
2   dispute concerning material facts; (6) whether the default was due
    to excusable neglect; and (7) the strong policy underlying the
3   Federal Rules of Civil Procedure favoring decisions on the merits.

4   Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986).  Default judgments are ordinarily

5   disfavored.  Id. at 1472.

6          As a general rule, once default is entered, well-pleaded factual allegations in the

7   operative complaint are taken as true, except for those allegations relating to damages.

8   TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam) (citing

9   Geddes v. United Fin. Group, 559 F.2d 557, 560 (9th Cir. 1977) (per curiam)); see also Fair

10  Housing of Marin v. Combs, 285 F.3d 899, 906 (9th Cir. 2002).  Although well-pleaded

11  allegations in the complaint are admitted by a defendant's failure to respond, "necessary facts

12  not contained in the pleadings, and claims which are legally insufficient, are not established by

13  default."  Cripps v. Life Ins. Co. of N. Am., 980 F.2d 1261, 1267 (9th Cir. 1992) (citing Danning

14  v. Lavine, 572 F.2d 1386, 1388 (9th Cir. 1978)); accord DIRECTV, Inc. v. Huynh, 503 F.3d 847,

15  854 (9th Cir. 2007) ("[A] defendant is not held to admit facts that are not well-pleaded or to

16  admit conclusions of law" (citation and quotation marks omitted).); Abney v. Alameida, 334 F.

17  Supp. 2d 1221, 1235 (S.D. Cal. 2004) ("[A] default judgment may not be entered on a legally

18  insufficient claim.").  A party's default conclusively establishes that party's liability, although it

19  does not establish the amount of damages.  Geddes, 559 F.2d at 560; cf. Adriana Int'l Corp. v.

20  Thoeren, 913 F.2d 1406, 1414 (9th Cir. 1990) (stating in the context of a default entered

21  pursuant to Federal Rule of Civil Procedure 37 that the default conclusively established the

22  liability of the defaulting party).

23                              DISCUSSION

24  A.      The Eitel Factors

25          1.      Factor One: Possibility of Prejudice to Plaintiff

26          The first Eitel factor considers whether the plaintiff would suffer prejudice if

                                        4

default judgment is not entered, and such potential prejudice to the plaintiff militates in favor of granting a default judgment.  See PepsiCo, Inc., 238 F. Supp. 2d at 1177.  Here, plaintiff would potentially face prejudice if the court did not enter a default judgment.  Absent entry of a default judgment, plaintiff would be without another recourse for recovery.  Additionally, given defendant's failure to participate in this litigation in any fashion, it is unlikely that defendant will cease use of the "Cal Eggs" mark in the absence of an entry of default judgment.  Accordingly, the first Eitel factor favors the entry of default judgment.

> 2.   Factors Two and Three: The Merits of Plaintiff's Substantive Claims and the Sufficiency of the Complaint

The undersigned considers the merits of plaintiff's substantive claims and the sufficiency of the complaint together because of the relatedness of the two inquiries.  The undersigned must consider whether the allegations in the complaint are sufficient to state a claim that supports the relief sought.  See Danning, 572 F.2d at 1388; PepsiCo, Inc., 238 F. Supp. 2d at 1175.

The Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), was enacted in 1999 to protect consumers and to prevent misappropriation of trademarks by stopping conduct known as "cybersquatting" or "cyberpiracy."  See ACPA, Pub. L. No. 106-113, 113 Stat. 1501 (1999) (codified at 15 U.S.C. § 1125(d)); Sporty's Farm L.L.C. v. Sportsman's Mkt., Inc., 202 F.3d 489, 493 (2d Cir. 2000).  The ACPA protects both federally-registered marks as well as unregistered marks.  DaimlerChrysler v. The Net Inc., 388 F.3d 201, 205 (6th Cir. 2004) (citing Two Pesos Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992)); see also 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:78 (4th ed. 2007).

In order to state a claim for cyberpiracy under the ACPA, a trademark owner must show the defendant (1) registered, trafficked in, or used a domain name, (2) that is confusingly similar to the plaintiff's trademark, and (3) had a bad faith intent to profit from that domain name.  15 U.S.C. § 1125(d)(1)(A); Verizon Cal. Inc. v. Navigation Catalyst Sys., Inc., 568 F.

1    Supp. 2d 1088, 1094 (C.D. Cal. 2008).  The ACPA, which amended the Lanham (Trademark)

2    Act, 15 U.S.C. § 1501 *et seq.*, states:

3           A person shall be liable in a civil action by the owner of a mark,
            including a personal name which is protected as a mark under this
4           section, if, without regard to the goods or services of the parties,
            that person—

5
                  (I) has a bad faith intent to profit from that mark, including
6                 a personal name which is protected as a mark under this
                  section; and
7
                  (ii) registers, traffics in, or uses a domain name that—
8
                         (I) in the case of a mark that is distinctive at the
9                        time of registration of the domain name, is identical
                         or confusingly similar to that mark;
10   15 U.S.C. 1125(d)(1)(A).

11          In determining whether there is a likelihood of confusion under the ACPA, courts

12   compare the plaintiff's mark with the name of the website.  <u>Coca-Cola Co. v. Purdy</u>, 382 F.3d

13   774, 782 (8th Cir. 2004) (holding that there was a likelihood of confusion under the ACPA

14   where defendant had registered websites including www. my-washingtonpost.com,

15   www.mymcdonalds.com and www.drinkcoke.org); <u>see also</u> <u>Louis Vuitton Malletier and Oakley,</u>

16   <u>Inc. v. Veit</u>, 211 F. Supp. 2d 567 (E.D. Pa. 2002) (holding that plaintiff owning Louis Vuitton

17   mark was entitled to default judgment on ACPA claim based on defendant's use of domain name

18   www.LouisVuittonreplicas.com).

19          A court should not look beyond the domain name to consider the content of the

20   website.  <u>Purdy</u>, 382 F.3d at 783.  "The inquiry under the ACPA is thus narrower than the

21   traditional multifactor likelihood of confusion test for trademark infringement."  <u>Id.</u>

22   Consequently, even if it might be evident from the content of the website that it is not sponsored

23   by or affiliated with the plaintiff, there may nonetheless be a violation of the ACPA.  <u>Id.</u>; <u>see</u>

24   <u>also</u> <u>People for Ethical Treatment of Animals v. Doughney</u>, 263 F.3d 359 (4th Cir. 2001)

25   (holding that domain name www.peta.org violated the ACPA because it was identical to the

26   mark of the plaintiff, People for the Ethical Treatment of Animals, even though a visit to the site

1    itself revealed that it was a parody and that the initials "peta" stood for People Eating Tasty

2    Animals).

3              On the other hand, if the name of the domain at issue itself makes clear that it is

4    not affiliated with the plaintiff, there can be no likelihood of confusion.  See, e.g., The Taubman

5    Co. v. Webfeats, 319 F.3d 770, 777 (6th Cir.2003) (holding that there was no likelihood of

6    confusion on part of plaintiff who owned Taubman mark where defendant operated website with

7    domain name www.taubmansucks.com); Bally Total Fitness Holding Corp. v. Faber, 29 F. Supp.

8    2d 1161 (C.D. Cal. 1998) (holding there was no likelihood of confusion on part of plaintiff

9    owning Bally mark where defendant operated website with domain name www.ballysucks.com).

10             Here, assuming the allegations in the complaint to be true, plaintiff meets the first

11   showing that it possessed a common law trademark for the mark "Cal Eggs," and that defendant

12   registered the domain name www.caleggs.com.  As to the second showing, the court concludes

13   that this domain name is confusingly similar to the "Cal Eggs" mark because it is identical to the

14   mark and it does not make clear that it is not affiliated with plaintiff.  Finally, plaintiff alleges

15   that defendant, who has not created any website associated with the domain name, offered to sell

16   the domain name to plaintiff for $500,000.  Having met all of the requirements under the ACPA,

17   the court concludes that these two factors weigh in favor of entry of default judgment.

18             3.     Factor Four: The Sum of Money at Stake in the Action

19             Under the fourth factor cited in Eitel, "the court must consider the amount of

20   money at stake in relation to the seriousness of Defendant's conduct."  PepsiCo, Inc., 238 F.

21   Supp. 2d at 1177; see also Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494,

22   500 (C.D. Cal. 2003).

23             Under the ACPA, plaintiff may elect as its measure of damages statutory damages

24   in the amount of not less than $1,000 and not more than $100,000 per domain name, as the court

25   considers just.  15 U.S.C. § 1117(d).  In general, when a plaintiff seeks statutory damages, "the

26   court has wide discretion in determining the amount of statutory damages to be awarded,

constrained only by the specified maxima and minima." <u>Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.</u>, 259 F.3d 1186, 1194 (9th Cir. 2001); <u>see also</u> <u>Harry and David v. Pathak</u>, 2010 WL 4955780, *5 (D. Or. 2010).  The policy behind Section 1117 damages is to "take all economic incentive out of trademark infringement."  <u>Intel Corp. v. Terabyte Int'l, Inc.</u>, 6 F.3d 614, 621 (9th Cir. 1993) (internal citation omitted).

Here, plaintiff seeks statutory damages of $1,000 for the willful violation of 15 U.S.C. § 1125(d).  This amount represents the minimum amount plaintiff would be permitted to recover under the statute.  Consequently, the factor does not weigh against plaintiff.

   4. <u>Factor Five: The Possibility of a Dispute Concerning Material Facts</u>

The facts of this case are relatively straightforward, and plaintiff has provided the court with well-pleaded allegations supporting its statutory claims and affidavits in support of its allegations.  Here, the court may assume the truth of well-pleaded facts in the complaint (except as to damages) following the clerk's entry of default and, thus, there is no likelihood that any genuine issue of material fact exists.[4]  <u>See</u>, <u>e.g.</u>, <u>Elektra Entm't Group Inc. v. Crawford</u>, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists."); <u>accord</u> <u>Philip Morris USA, Inc.</u>, 219 F.R.D. at 500; <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1177.

   5. <u>Factor Six: Whether the Default Was Due to Excusable Neglect</u>

Upon review of the record before the court, the undersigned finds that the default was not the result of excusable neglect.  <u>See</u> <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1177.  Plaintiff served the defendant with the summons and complaint.  Moreover, plaintiff served defendant by mail at three different addresses attributable to defendant with notice of its application for default

---

[4] Defendant's failure to file an answer in this case or a response to the instant default application further supports the conclusion that the possibility of a dispute as to material facts is minimal.

1  judgment.  Despite ample notice of this lawsuit and plaintiff's intention to seek a default

2  judgment, defendant has not appeared in this action to date.  Thus, the record suggests that

3  defendant has chosen not to defend this action, and not that the default resulted from any

4  excusable neglect.  Accordingly, this <u>Eitel</u> factor favors the entry of a default judgment.

5      6.    <u>Factor Seven: The Strong Policy Underlying the Federal Rules of Civil Procedure
            Favoring Decisions on the Merits</u>

6

7      "Cases should be decided upon their merits whenever reasonably possible."  <u>Eitel</u>,

8  782 F.2d at 1472.  However, district courts have concluded with regularity that this policy,

9  standing alone, is not dispositive, especially where a defendant fails to appear or defend itself in

10 an action.  <u>PepsiCo, Inc.</u>, 238 F. Supp. 2d at 1177; <u>see also</u> <u>Craigslist, Inc. v. Naturemarket, Inc.</u>,

11 694 F. Supp. 2d 1039, 1061 (N.D. Cal. Mar. 5, 2010); <u>ACS Recovery Servs., Inc. v. Kaplan</u>,

12 2010 WL 144816, at *7 (N.D. Cal. Jan. 11, 2010) (unpublished); <u>Hartung v. J.D. Byrider, Inc.</u>,

13 2009 WL 1876690, at *5 (E.D. Cal. June 26, 2009) (unpublished).  Accordingly, although the

14 undersigned is cognizant of the policy in favor of decisions on the merits—and consistent with

15 existing policy would prefer that this case be resolved on the merits—that policy does not, by

16 itself, preclude the entry of default judgment.

17     Upon consideration of the <u>Eitel</u> factors, the undersigned concludes that plaintiff is

18 entitled to the entry of default judgment against defendant and will make a recommendation to

19 that effect.  What remains is the determination of the amount of damages to which plaintiff is

20 entitled.

21 B.   <u>Terms of Judgment</u>

22     1.    <u>Statutory Damages</u>

23     After determining that a party is entitled to entry of default judgment, the court

24 must determine the terms of the judgment to be entered.  Considering plaintiff's briefing and the

25 record in this case, including the affidavits and declarations submitted by plaintiff, the

26 undersigned concludes that plaintiff is entitled to an award of statutory damages in the amount of

9

1  $1,000 as a result of defendant's cyberpiracy, and will recommend the same.

2        2.    Injunctive Relief

3        Plaintiff seeks a permanent injunction prohibiting defendant from engaging in

4  further acts of trademark infringement and a permanent transfer of the domain name.  The ACPA

5  authorizes courts to transfer domain names to the owner of the mark.  15 U.S.C. § 1125(d)(1)(c).

6  "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there

7  is no adequate remedy at law for the injury caused by defendants' continuing infringement."

8  Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175 (9th Cir. 1988).

9        "According to well-established principles of equity, a plaintiff seeking a

10 permanent injunction must satisfy a four-factor test before a court may grant such relief.  A

11 plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies

12 available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

13 that, considering the balance of hardships between the plaintiff and defendant, a remedy in

14 equity is warranted; and (4) that the public interest would not be disserved by a permanent

15 injunction." eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (citations omitted).

16       A permanent injunction is appropriate here.  First, plaintiff would suffer

17 irreparable injury if visitors to the www.caleggs.com website were directed to a website

18 unaffiliated with plaintiff.  See Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd., 518 F.

19 Supp. 2d 1197, 1215 (C.D. Cal. 2007) ("Plaintiffs may establish an irreparable harm stemming

20 from the infringement (e.g., loss of market share, reputational harm).").  Second, monetary

21 damages are also inadequate on their own; defendant's conduct can be considered willful and he

22 has given no indication that he will not infringe in the future as he has chosen not to participate

23 in this litigation.  See Adobe Sys. Inc. v. Brooks, 2009 WL 593343, at *3 (N.D. Cal. Mar. 5,

24 2009) ("[Defendant's] refusal to answer or appear in this litigation has given the court no

25 assurance that [Defendant's] infringing activity will cease and makes it difficult for [Plaintiff] to

26 prevent further infringement.").  Third, the balance of harms clearly favors plaintiff, since

defendant would suffer none; being required to comply with the law is not a harm.  See Triad Sys. Corp. v. Southeastern Exp. Co., 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense 'merits little equitable consideration [on an appeal from a preliminary injunction].' ") (citation omitted).  And fourth, the public interest is served when trademark holders' rights are protected against infringement.  See Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd., 518 F. Supp. 2d at 1222 ("[T]he public interest will be served with a permanent injunction, since it will protect Plaintiffs' copyrights against increased infringement.").

At the time plaintiff applied for injunctive relief, the domain name was registered to defendant.  As stated above, plaintiff has shown that the defendant created the website www.caleggs.com in bad faith and willfully.  Therefore, injunctive relief should be granted, and the domain name www.caleggs.com should be transferred to plaintiff, as requested.  Based on evidence of defendant's infringement, the court finds injunctive relief to be appropriate.

3.    Attorneys' Fees

Finally, plaintiff seeks an award of attorneys' fees in the amount of $14,050. Under the Lanham Act, attorneys' fees should only be granted in "exceptional" cases.  The Ninth Circuit has held that "exceptional" refers to those cases where the defendant's behavior has been malicious, fraudulent, deliberate, or willful.  See Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1384 (9th Cir. 1984); Playboy Enters., Inc. v. Baccarat Clothing Co., 692 F.2d 1272, 1276 (9th Cir. 1982).  Willful infringement occurs when the defendant knowingly and intentionally infringes on a trademark.  See Earthquake Sound Corp. v. Bumper Indus., 352 F.3d 1210, 1216-17 (9th Cir. 2003).  Willfulness can also be inferred from a defendant's failure to defend.  Philip Morris USA, Inc. v. Castworld Prods., Inc., 219 F.R.D. 494, 500 (C.D. Cal. 2003).  Here, because the defendant's conduct can be deemed willful and deceptive in light of his failure to defend this action, in combination with his demand for payment, plaintiff is entitled to an award

1  of attorneys' fees.

2          The starting point for determining reasonable fees is the calculation of the

3  "lodestar," which is obtained by multiplying the number of hours reasonably expended on

4  litigation by a reasonable hourly rate.  Jordan v. Multnomah Cnty., 815 F.2d 1258, 1262 (9th Cir.

5  1987) (citing Hensley v. Eckerhart, 461 U.S. 424, 103 (1983)).  In determining a reasonable

6  number of hours, the court must review records to determine whether the hours claimed by the

7  applicant are adequately documented and whether any of the hours claimed by the applicant

8  were unnecessary, duplicative, or excessive.  Chalmers v. City of Los Angeles, 796 F.2d 1205,

9  1210 (9th Cir. 1986), reh'g denied, amended on other grounds, 808 F.2d 1373 (9th Cir. 1987).

10  To determine a reasonable rate for each attorney, the court must look to the rate prevailing in the

11  community for similar work performed by attorneys of comparable skill, experience and

12  reputation.  Id. at 1210-11.

13          Plaintiff's counsel, a litigator with 13 years of experience, claims that she worked

14  56.20 hours on this case at an hourly rate of $250.  Scott Decl. ¶¶ 14-15.  This rate is less than

15  the $445 per hour rate provided for in the Laffey Matrix, which is an inflation-adjusted grid of

16  hourly rates for lawyers of varying levels of experience in Washington, D.C. and used in the

17  District of Columbia.  See Scott Decl., Ex. H; Laffey v. Northwest Airlines, Inc., 572 F. Supp.

18  354, 371-75 (D.D.C. 1983), aff'd in part, rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir.

19  1984).  The Laffey Matrix has also been used by district courts in California as a guide in

20  determining the reasonableness of attorneys' fees.  See Rivera v. Rivera, 2011 WL 3667486

21  (N.D. Cal. Aug. 22, 2011) (awarding attorney $230 per hour in a default judgment wage and

22  hour case based on Laffey Matrix); Theme Promotions, Inc. v. News America Marketing FSI,

23  Inc., 731 F. Supp. 2d 937 (N.D. Cal. 2010) (using Laffey Matrix to award fees in antitrust case).

24  But see Prison Legal News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir. 2010) ("[J]ust

25  because the Laffey matrix has been accepted in the District of Columbia does not mean that it is

26  a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away.").

1    While the use of the Laffey Matrix is suspect in determining the reasonableness of

2  fees charged in a city nearly 3000 miles away from and less than half the size of the District of

3  Columbia, the court nonetheless finds the fees to be reasonable and in line with other cases

4  where attorneys' fees and costs were awarded for trademark infringement default judgments.

5  See Belks Media v. OnlineNIC, 2010 WL 7786122 (N.D. Cal. 2010) (awarding $13,695.10 in

6  attorneys' fees and costs); Yahoo!, Inc. v. Net Games, Inc., 329 F. Supp. 2d 1179, 1188-93 (N.D.

7  Cal. 2004) (awarding $16,964 in attorneys' fees and costs).

8    Accordingly, IT IS HEREBY ORDERED that the April 24, 2013 hearing on

9  plaintiff's motion for default judgment is vacated; and

10    IT IS HEREBY RECOMMENDED that:

11    1.    Plaintiff's application for default judgment be granted;

12    2.    The court enter judgment against defendant on plaintiff's claims brought

13  pursuant to the Anti Cyber-Squatting Protecting Action, 15 U.S.C. § 1125(d);

14    3.    The court award statutory damages in an amount of $1,000;

15    4.    Plaintiff be granted attorneys' fees in the amount of $14,050;

16    5.    Defendant be directed to relinquish all rights to the "Cal Eggs" domain

17  name, known as www.caleggs.com, within 30 days of entry of default judgment;

18    6.    Defendant be directed to turn over to plaintiff all rights to the "Cal Eggs"

19  domain name, known as www.caleggs.com, within 30 days of entry of default judgment;

20    7.    The domain registrar be authorized to transfer the "Cal Eggs" domain

21  name, known as www.caleggs.com, to plaintiff at plaintiff's request if defendant fails to do so

22  within 30 days of entry of default judgment; and

23    8.    This case be closed.

24    These findings and recommendations are submitted to the United States District

25  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

26  days after being served with these findings and recommendations, any party may file written

1  objections with the court and serve a copy on all parties.  Such a document should be captioned

2  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

3  within the specified time may waive the right to appeal the District Court's order.  Turner v.

4  Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir.

5  1991).

6  DATED: April 16, 2013.

7

8  ALLISON CLAIRE
   UNITED STATES MAGISTRATE JUDGE

9

10

11  /mb;nuca2754.mdj

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26